IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSUMERS INSURANCE USA | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 19-1853 |
| HUNTLEIGH DEALERSHIP | : | |
| SERVICES, INC. *et al.* | : | |

**OPINION**

**YOUNGE, J.**                                                                                                         **MAY 5, 2022**

In this insurance coverage dispute, Plaintiff Consumers Insurance USA ("Consumers") seeks a declaratory judgment that it has no duty to insure, defend, or indemnify Defendants Huntleigh Dealership Services, Inc., and Huntleigh Bus Sales, Inc. (collectively, "Huntleigh"), for any claims or causes of action arising out of a May 2017 motor vehicle accident ("the accident"). Huntleigh opposes Consumers' interpretation, and asserts it is covered under the terms set forth in Policy No. AD 29160359-4 ("the Policy"), as well as the subsequent renewal policy. After conducting discovery, both parties moved for summary judgment. For the reasons set forth, we deny Huntleigh's Motion for Summary Judgment and grant Consumers', finding that Consumers owes no obligation to cover Huntleigh under the terms of the inactive policies.

**I.      BACKGROUND[1]**

Prior to this dispute, Huntleigh, which is in the business of buying and selling new and used buses, sought an insurance policy for its business from Consumers. Consumers issued, and Huntleigh agreed to, a "Garage Policy" that insured Huntleigh's "garage operations," including its inventory of unsold buses. The Policy contained, in relevant part, the following clauses:

---
[1] The factual background is derived from the parties' statements of undisputed material facts ("SUMF") and other summary judgment submissions, including the exhibits attached thereto.

SECTION II – LIABILITY COVERAGE

   A. Coverage

      1. "Garage Operations" – Other Than Covered "Autos"

         a. We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies caused by an "accident" and resulting from "garage operations" other than the ownership, maintenance, or use of covered "autos."

         We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the applicable Liability Coverage Limit of Insurance – "Garage Operations" – Other Than Covered "Autos" has been exhausted by payment of judgments or settlements.

         **b. This insurance applies to "bodily injury" and "property damage" only if:**
            (1) the "accident" occurs in the coverage territory;
            (2) **the "bodily injury" or "property damage" occurs during the policy period**; and
            (3) prior to the policy period, no "insured" listed under Who Is An Insured and no "employee" authorized by you to give or receive notice of an "accident" or claim knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed "insured" or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

      2.    "Garage Operations" - Covered "Autos"
         **We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from "garage operations" involving the ownership, maintenance or use of covered "autos."**

         We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from "garage operations" involving the ownership, maintenance or use of covered "autos." However, we will only pay for the

"covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance - "Garage Operations" - Covered "Autos" has been exhausted by payment of judgments or settlements.

[. . .]

SECTION V – GARAGE CONDITIONS

**The following conditions apply in addition to the Common Policy Conditions:**

B. General Conditions

7. Policy Period, Coverage Territory

**Under this coverage form, we cover:**
    a.    **"Bodily injury", "property damage" and "losses" occurring; and**
    b.    "Covered pollution cost or expense" arising out of "accidents" occurring;
**during the policy period shown in the Declarations and within the coverage territory.**

The coverage territory is:
    (1)    The United States of America;
    (2)    The territories and possessions of the United States of America;
    (3)    Puerto Rico;
    (4)    Canada; and
    (5)    Anywhere in the world if:
        (a)    A covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and
        (b)    The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America the territories and possessions of

> the United States of America, Puerto Rico or Canada or in a settlement we agree to.
> We also cover "bodily injury", "property damage", "covered pollution cost or expense" and "losses" while a covered "auto" is being transported between any of these places.

[. . .]

SECTION VI – DEFINITIONS

> H. "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. **"Garage operations" includes the ownership, maintenance or use of the "autos" indicated in Section I of this coverage form as covered "autos."** "Garage operations" also include all operations necessary or incidental to a garage business.

[. . .]

PRODUCT LIABILITY EXCLUSION

It is understood and agreed the Insurer (Consumers Insurance USA) shall not be liable to make payment for Loss on account of any Claim based upon, arising out of or attributable to any deficiency, malfunction or defect of any kind of any product manufactured, designed, distributed or sold by the Insured.

(*See* Consumers' Motion for Summary Judgment ("Con. MSJ"), ECF No. 13 at Exhibit A, pp. 4-6, 16, 19, and 61; *see also* Huntleigh's Motion for Summary Judgment ("Hunt. MSJ"), ECF No. 15.) (emphasis added).)

As stated at the beginning of the document, the policy was effective November 30, 2014, until November 30, 2015. The parties renewed the policy for a period of November 30, 2015, to November 30, 2016. (Con. MSJ, Exhibit A at p. 1, Exhibit B at p. 1.) After the expiration of the renewal period, Consumers no longer insured Huntleigh in any capacity. Consumers provided Huntleigh with a Notice of Non-Renewal on September 30, 2016. (*Id*. at Exhibit U.)

In 2015, while the Policy was still in effect, Huntleigh sold a school bus to FKW, Inc., a/k/a Werner Bus Lines (hereinafter referred to as "Werner").[2] (Con. SUMF ¶ 6, Hunt. SUMF ¶ 6.) Huntleigh transferred title of the bus to Werner, which operates a charter bus business in the Philadelphia area. (Con. SUMF ¶ 7, Hunt. SUMF ¶ 7.)

Nearly two years later, Werner contracted with the Philadelphia School District to provide Charles W. Henry Elementary School with a charter bus for an 8th grade field trip to Washington, D.C. (Con. SUMF ¶ 8, Hunt. SUMF ¶ 8.) Werner provided the bus and an employee driver. (Con. SUMF ¶ 9, Hunt. SUMF ¶ 9.) While traveling on Interstate 95 in Maryland, the bus was involved in an accident in which all the children and adults on board were injured. (Con. SUMF ¶ 10, Hunt. SUMF ¶ 10.)

As a result, at least seventeen of the passengers filed suit in the Philadelphia Court of Common Pleas seeking personal injury damages as a result of the bus accident. (Con. SUMF ¶ 11, Hunt. SUMF ¶ 11.) As it pertains to this case, the claimants allege theories sounding in product liability (strict liability, negligent product liability, breach of warranties) against Huntleigh.[3] (Con. SUMF ¶ 12, Hunt. SUMF ¶ 12.) In particular, the claims against Huntleigh include allegations that it sold a defective product to Werner in 2015 since the bus did not have any seat belts and the windows were improperly laminated. (Con. SUMF ¶ 13-14.)

In response to this accident, Consumers issued a denial of coverage letter on January 21, 2019 regarding the claims arising out of the bus accident. (Con. MSJ at Exhibit V.) Consumers stated that the allegations asserted against Huntleigh does not describe the operation, maintenance, or use of a covered auto in Huntleigh's garage operations, since the bus was sold to Werner more

---

[2] The bus is a 2006 International (Navistar), outfitted by the Krystal Bus Company as a 2006 Krystal model KK38 (hereinafter "the bus"). (Con. SUMF ¶ 3, Hunt. SUMF ¶ 3.)
[3] The claimants allege theories of negligent driving, respondeat superior, negligent hiring, and entrustment against Werner, and various product liability claims against Navistar and Krystal.

than two years before the accident occurred and thus occurred outside the policy period. (*Id*. at *4.) Further, Consumers stated that even if the loss did occur during the policy period, the Product Liability Exclusion would "significantly limit" coverage for the loss. Regardless, it contends the loss occurred outside the policy period. (*Id*.)

On April 26, 2019, Consumers filed a declaratory judgment action requesting this Court enter an order stating it has no duty to insure, defend, or indemnify Huntleigh since its coverage had expired on November 30, 2016. (ECF No. 1 at 8-12.) Alternatively, should the Court find the Policy to be in effect, Consumers sought a declaratory judgment that there was no coverage based on the products liability exception. (*Id*. at 12-13.) Lastly, Consumers sought a declaration that it had no duty to insure, indemnify, or defend Huntleigh in any of the listed lawsuits pending in state court. (*Id*. at 13-17.) Huntleigh filed an Answer on June 28, 2019. (ECF No. 6.)

On October 10, 2019, Consumers moved for summary judgment. (ECF No. 13.) Thereafter, Huntleigh filed a response to Consumers' motion and its own motion for summary judgment on November 15, 2019. (ECF Nos. 14, 15.) Both parties filed responsive briefs in response thereto. (ECF Nos. 16, 18, 20.)

## II.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When making this determination, we must weigh all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). "For its part, '[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials [in] his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue

for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Id*. at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. at 289 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Conversely, 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.'" *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). "The same standards and burdens apply on cross-motions for summary judgment." *Allah v. Ricci*, 532 F. App'x 48, 50 (3d Cir. 2013) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)).

### III. DISCUSSION

#### A. Choice of Law

Since this Court sits in diversity, this Court must "apply the substantive law as decided by the highest court of the state whose law governs the action." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1373 (3d Cir. 1996). Huntleigh is located in Missouri, and Consumers' principal place of business is in Ohio. Huntleigh sold the bus to Werner, which is a Pennsylvania corporation. The bus accident occurred in Maryland. All the injured students are Pennsylvania residents, as is the bus driver. The underlying cases for which Huntleigh seeks indemnity were filed in the Philadelphia Court of Common Pleas.

In *Griffith v. United Airlines Inc.*, 203 A.3d 796, 805 (Pa. 1964), the Pennsylvania Supreme Court adopted a "more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." Courts are directed to apply the substantive law of the state

with the "most interest in the problem." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007). Under *Griffith*, the first step is to determine whether a conflict exists between the laws of the competing states. The parties agree Pennsylvania and Missouri have the most significant interests in the resolution of this matter.

In this case, we are charged with interpreting the language of the requisite insurance policy and determining whether coverage is provided based on the particular facts before us. Pennsylvania and Missouri share similar law in interpreting insurance contracts. Under Pennsylvania law, courts interpreting insurance policies "are guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). We thus "apply traditional principles of contract interpretation in ascertaining the meaning of the terms used therein." *Id*. A court must consider the insurance policy in total, giving each term its plain meaning and giving effect to all of the provisions, and must not view any one provision or word in isolation. *See Delaware Cnty. Const. Co. v. Safeguard Ins. Co.*, 502 A.2d 15, 17 (Pa. Super. 1967) (citing *Newman v. Massachusetts Bonding & Ins. Co.*, 361 Pa. 587, 65 A.2d 417 (Pa. 1949)). If the policy terms are clear and unambiguous, we must give effect to the plain and ordinary meaning of those terms. *See Kurach*, 235 A.3d at 1116. If, however, an ambiguity is identified in the policy, we must construe it in favor of the policyholder. *Id*. Insurance provisions are considered ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id*. (quoting *Madison Constr. Co. v. Harleysville Mut. Ins.*, 735 A.2d 100, 106 (1999)). "[T]he lack of a definition for an operative term," however, "does not necessarily render the policy ambiguous." *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 847–48 (Pa. Super. Ct. 2020).

"In Pennsylvania, the insured has the burden 'to establish coverage under an insurance policy.'" *Easy Corner, Inc. v. State Nat'l Ins. Co.*, 154 F. Supp. 3d 151, 154 (E.D. Pa. 2016) (quoting *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206 (3d Cir. 2001).)  Then, "[if] the dispute involves an exclusion in the insurance policy, 'the burden is upon the insured to show that a loss has occurred; thereafter, the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion.'" *United Nat'l Ins. Co. v. Indian Harbor Ins. Co.*, 160 F. Supp. 3d 828, 839 (E.D. Pa. 2016) (quoting *Wexler Knitting Mills v. Atl. Mut. Ins. Co.*, 555 A.2d 903, 905 (Pa. Super Ct. 1989)).

Missouri courts undertake a similar analysis as Pennsylvania court. Courts in Missouri are charged with "interpret[ing] and enforce[ing] an insurance policy as written, not to rewrite the contract." *Lupo v. Shelter Mut. Ins. Co.*, 70 S.W.3d 16, 21 (Mo. App. E.D. 2002). As in Pennsylvania, Missouri courts must determine whether a policy's language is ambiguous or unambiguous. *Todd v. Missouri United School Ins. Council*, 223 S.W.3d 156, 160 (Mo. 2007) (citations omitted). In determining whether the language of a policy is ambiguous, the court considers the language in light of the meaning that would normally be understood by the layperson who bought and paid for the policy. *Bowan v. General Sec. Indemn. Co. of Arizona*, 174 S.W.3d 1, 8 (Mo. App. E.D. 2005). In determining whether the language is ambiguous, the court will read the policy as a whole. *Id*. "Where insurance policies are unambiguous, the rules of construction are inapplicable, and absent a public policy to the contrary, the policy will be enforced as written." *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210 (Mo. 1992). However, if a policy is ambiguous, the rules of construction will apply and the ambiguous provisions will be construed against the insurer. *Id*. An ambiguity arises where "due to duplicity, indistinctness, or uncertainty in the meaning of the words used, the policy is reasonably open to different constructions." *Farm

*Bureau Town & Country Ins. Co. of Missouri v. Barker*, 150 S.W.3d 103, 106 (Mo. App. W.D. 2004) (citations omitted). As in Pennsylvania, the court may not "unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity when none exists." *Todd*, 223 S.W.3d at 163. Based on the above, we are satisfied that Missouri and Pennsylvania law regarding the broad tenets of insurance contract interpretation does not conflict.

In this case, we are also charged with determining when occurrence-based policies cover negligent acts or omissions.[4] In Pennsylvania, an occurrence policy "provides coverage for any 'occurrence' which takes places during the policy period." *PECO Energy Co. v. Boden*, 64 F.3d 852, 856 (3d Cir. 1995). An occurrence, for purposes of an insurance contract, happens when the injurious effects of the negligence first manifest themselves in such a way that would put a reasonable person on notice of the injury. *Consulting Engineers, Inc. v. Ins. Co. of North America*, 710 A.2d 82 (Pa. Super. 1998). In Missouri, occurrence-based policies cover negligent acts or omissions which occur within the policy period, regardless of the date when the negligent acts or omissions are discovered or claim is made. *Continental Cas. Co. v. Maxwell*, 799 S.W.2d 882, 886 (Mo. App. W.D. 1990). An occurrence takes place "not the time the alleged wrongful act was committed, but is the time when the complaining party was actually damaged." *Nationwide Ins. Co. v. Cent. Missouri Elec. Co-op., Inc.*, 278 F.3d 742, 746 (8th Cir. 2001) (italics omitted). Based on the above, we are satisfied there is no conflict of law regarding whether an occurrence under an insurance policy has taken place, since both jurisdictions agree that an occurrence has transpired not when the event occurs, but when its effects are apparent.[5]

---

[4] We note Huntleigh's argument that the Policy is ambiguously written. We assume, *arguendo*, that the Policy is in fact an occurrence-based policy.

[5] Since there is no conflict between Missouri law and Pennsylvania law, both states' laws may be referred to interchangeably. *See, e.g., Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229-30 (3d Cir. 2007); *Huber v. Taylor*, 469 F.3d 67 (3d Cir. 2006). Both parties agree that the laws implicated in the resolution of this matter do not conflict.

### B.     The Policy Does Not Cover Defendant's Claim

Consumers argues that Huntleigh is not covered by the Policy because Huntleigh did not "own, maintain, or use" the bus as stated in Section II(A)(2). (Con. MSJ at 6-8, 19-20.) Since the bus was sold by Huntleigh to Werner in April, 2015, Huntleigh did not own, maintain, or use the bus in any fashion at the time of the accident in May, 2017. (*Id*.) Since the bus was not a covered auto, Consumers asserts coverage does not apply. (*Id*.) Regardless of whether the bus was a covered auto, Consumers argues the accident occurred after the Policy expired. (*Id*. at 10-11.) For the reason set forth below, we agree.

As a threshold matter, we interpret the policy as an occurrence-based policy. As stated above, the relevant portion of the policy states that coverage is extended to "'bodily injury', 'property damage' and 'losses' occurring . . . during the policy period shown in the Declarations and within the coverage territory." (*Id*. at Exhibit A and B at Section V(B)(7).)[6] "An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 892 (Pa. 2006). In view of the Policy's unambiguous language and considered in its entirety, the Policy is an "occurrence" policy. It is clear, based on unambiguous language, that only qualifying occurrences transpiring during the coverage period are covered. The Policy specifically focuses on the act causing injury as the coverage "trigger" and specifically requires this injury to occur during the applicable policy period. In Pennsylvania, such language has been interpreted as signifying an occurrence-based policy. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1 (Pa. 2014) ("Under the terms of the CGL policies at issue, Penn National agreed to indemnify LPH Plumbing

---

[6] We note that the parties, at various times, incorrectly referred to this provision as Section V(A)(7).

for its liabilities arising from either bodily injury or property damage that occurred during the respective policy periods, making these "occurrence" policies."). Many other jurisdictions have arrived at a similar conclusion. *See, e.g., Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1192 (2d Cir. 1995) ("Unlike 'claims-made' policies in wide use today, which require the assertion of a claim against the insured during the policy period, NGC's 'occurrence-based' policies respond to its liabilities arising out of 'bodily injury' or 'property damage' that took place during the time that such policies were in effect, even if the claim is not made until years after the termination of the policy."); *Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415, 417 (7th Cir. 1993) ("Section I of the policy . . . provides: 'This insurance applies only to 'bodily injury' and 'property damage' which occurs during the policy period. The 'bodily injury' or 'property damage' must be caused by an 'occurrence.'" We give this language its plain and ordinary meaning . . . and conclude that Baylor's policy covers only events occurring within the policy period."); *Trizec Properties, Inc. v. Biltmore Const. Co., Inc.*, 767 F.2d 8810 (11th Cir. 1985) (explaining that a policy defining property damage as damage occurring within the policy period was an occurrence-based policy); *Sentinel Ins. Co. v. First Ins. Co. of Hawai'i*, 875 P.2d 894, 904–05 (HI. 1994) ("Because coverage under the First Insurance policies is contingent upon an occurrence or accident resulting in property damage during each policy period, the policies are 'occurrence' policies as opposed to 'claims made' or 'discovery' policies."). Moreover, nothing in the Policy would allow, as a reasonable interpretation, that the Policy extend coverage as to claims made outside the time period stated in the Policy.

Huntleigh attempts to persuade this Court that the language within the Policy indicates it is not an occurrence-based policy, or that the terms of the Policy are ambiguous. (Hunt. MSJ at 9-11, 22-28.) Specifically, Huntleigh argues that since Section II(A)(1) - "Other Than Covered

Autos" specifies that coverage only applies during the applicable policy period, the fact that Section II(A)(2) relating to "Covered Autos" does not contain the same language means the same limitation does not apply. (*Id*. at 22-24.) It also argues that Section V(B)(7) fails to specify whether its limiting language applies to the relevant section. (*Id*. at 24.) Alternatively, it argues that even if Section V were applicable, the coverage exclusion for accidents occurring outside the policy period does not apply. (*Id*. at 24-27.)

We disagree. As stated above, a policy is ambiguous when, due to indistinctness or uncertainty in the meaning of the words, a policy is reasonably open to different constructions. Huntleigh points to the absence of language in Section II(A)(2) to create an ambiguity. We have found no case law to support the proposition that the absence of language, rather than its presence, is sufficient to create an ambiguity. Regardless, the tenets of insurance contract interpretation dictate that the policy must be construed as a whole, and effect must be given to each part. "[A]ll provisions of an insurance contract must be read together and construed according to the plain meaning of the words involved, so as to avoid ambiguity while at the same time giving effect to all of its provisions." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517 (3d Cir. 2012) (quoting *Masters v. Celina Mut. Ins. Co.*, 209 Pa. Super. 111, 224 A.2d 774, 776 (1966)). When considering the Policy as a whole, the occurrence-based nature of the Policy is apparent based on the plain language of Section V(B)(7). While Huntleigh attempts to argue that the language of Section V(B)(7) is itself ambiguous based on its reference to "this coverage form", we do not consider this language to rise to the level of such confusion. When interpreting a policy, its language should not be stretched beyond its plain meaning to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011). Read plainly, "this coverage form" is meant to refer to the entire form, which includes Section II(A)(2). While we agree with Huntleigh that this language renders

the limiting language in Section II(A)(1) redundant, this particular drafting anomaly does nothing to render the meanings of the various portions of the Policy uncertain or indistinct.

Since the accident occurred outside of the relevant policy period, we conclude coverage should be denied. Read plainly, the applicable policy periods state that the policies were effective November 30, 2014 through November 30, 2015, and November 30, 2015 through November 30, 2016, respectively. Huntleigh received prior notice that upon the expiration of its second policy, coverage would not be renewed. Huntleigh thus did not have an effective policy with Consumers at the time of the accident on May 15, 2017. As the occurrence Huntleigh claims triggers coverage, this event would have had to occur within the timeframe stated in the Policy (amongst other things) to invoke Consumers' duties as the insurer. Since it clearly did not, Huntleigh was not insured by Consumers at the time of the accident and thus, Consumers owes no duty to defend, insure, or indemnify. *See, e.g., Evanston Ins. Co. v. Via Ent.*, LLC, 2020 WL 5995665 (M.D. Fla. Oct. 6, 2020) (denying coverage for an occurrence that transpired approximately 50 minutes after the policy period had expired); *Clarendon America Ins., Co. v. Bayou Fleet Service, Inc.*, 2008 WL 4758668 (W.D. La. Oct. 29, 2008) (denying coverage for an automobile accident that occurred after the expiration of the insurance policy period); *Gullo v. Motorists Mut. Ins. Co.*, 1995 WL 461863 (N.D. Ill. Jul. 17, 1995) (determining a policy provides no coverage where the triggering event occurred outside of the policy period).

Huntleigh attempts to circumvent the limits of the policy periods by claiming that the policy covers "any auto" in use by Consumers. (Hunt. MSJ at 6-9, 16-20.) Since the policies specify no limiting on "use," either by time or by operator, Huntleigh argues Werner's operation of the bus on the date of the accident qualifies as an occurrence that falls under the terms of the policies. (*Id.*) We disagree.

Since the word "use" is not a defined term, we turn to basic tenets of contract interpretation. In such a case, "[w]ords of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions." *Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. Ct. 2007). However, such terms must "be read in light of the context and the overall provisions of the policy in which [they] appear[ ]." *Jennings v. Hartford Fire Ins. Co.*, 1991 WL 68019, at *3 (E.D. Pa. Apr. 25, 1991) (citing *Luko v. Lloyd's of London*, 573 A.2d 1139, 1142 (1990)).

Applying these principles, we interpret "use" to mean Huntleigh's use, rather than a third party's such as Werner's. Black's Law Dictionary defines the term as "the application or employment of something." *Black's Law Dictionary* (11th ed. 2019). When considering this definition, it is difficult to understand how Huntleigh had been "using" the bus at the time of the accident when Huntleigh neither owned nor operated the bus, nor did it employ the driver responsible for the accident. Moreover, it had no relationship with Werner beyond the transaction regarding the purchase of the bus. Thus, it is difficult to understand how Huntleigh could fairly be understood as employing the bus in any way consistent with common usage of the term.

Further, Huntleigh's construction of the term "use" would extend coverage in perpetuity. By stating that the lack of any explicitly-stated modifier means there is no limit to coverage, Huntleigh essentially extends the policies to any occurrence it claims, regardless of when it happened or who was operating the vehicle. This interpretation of the policy belies the plain intent of the parties, which is demonstrated through the words of the policy. *See, e.g., Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir.1999) (a policy must be read as a whole and its meaning construed according to its plain language). Based on the language of the

policy, Consumers and Huntleigh entered into a contract for indemnification for events that transpired during a specified time period, as is common in the insurance industry. By twisting the term "use" into a limitless conveyor of unspecified liability, Huntleigh turns a blind eye to other logical sections of the policy that clearly provide limits to coverage. We agree with Consumers that coverage does not extend ad infinitum, and more specifically, ceased before the date of the accident. *See, e.g., Home Ins. Co. v. McGovern*, 837 F. Supp. 661 (E.D. Pa. 1993) (personal use of car unrelated to operation of garage business); *Century Sur. Co. v. BTCD Auto Sales, LLC*, 2010 WL 5088241 (M.D. Pa. 2010) (denying coverage where the "use" of a vehicle occurred by someone not employed by the insured, away from the premises, and after business hours).

As explained above, the plain meaning of the words contained in the Policy are not ambiguous. The Policy plainly provides for coverage during the specified time period upon the occurrence of an event contemplated by the Policy. Since the accident in question occurred after the Policy had transpired, it was not a loss that was covered under the Policy. Furthermore, since Huntleigh was not "using" the bus, we grant summary judgment in favor of Consumers and find it does not owe any duty to defend or indemnify Huntleigh in the included cases pending in the Philadelphia Court of Common Pleas. Based on the narrow grounds we have decided the preceding issues, we decline to weigh in on the application of the Products Liability Exception as briefed by both parties.

## IV. CONCLUSION

For the foregoing reasons, Consumers' Motion for Summary Judgment will be granted, and Huntleigh's Motion for Summary Judgment will be denied. An appropriate order follows.

**BY THE COURT:**

 /s/ John Milton Younge
**JUDGE JOHN MILTON YOUNGE**